**FILED**
**FEBRUARY 25, 2025**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SEBASTIAN SCHEIFF and EILEDON MCCLELLAN, | ) ) ) | No. 39650-9-III |
| Appellants, | ) ) | |
| v. | ) ) | |
| JULIE CAREY DEL MORO, an individual; NANCY CAREY DANFORTH, an individual, | ) ) ) ) | UNPUBLISHED OPINION |
| Defendants, | ) ) ) | |
| MIRIAM GRANT, an individual; HERITAGE LAND GROUP, LLC d/b/a NORTHWEST FIRST REALTORS, a Washington Limited Liability Company, | ) ) ) ) ) | |
| Respondents. | ) | |

FEARING, J. — Sebastian Scheiff and Eiledon McClellan, buyers of residential property, sue the sellers' broker, Miriam Grant, for negligence. Scheiff and McClellan assert that the broker breached duties under the common law and under RCW 18.86.030 by failing to disclose, before the closing of the sale, the presence of asbestos in the residence's roof, underground storage tanks, and soil contamination from oil. Scheiff and

McClellan appeal from a summary judgment dismissal of the action. We affirm because the undisputed facts show that Scheiff and McClellan either did or could have readily ascertained the presence of the asbestos, tanks, and contamination.

FACTS

We take the facts from summary judgment declarations filed in support of and in opposition to real estate agent Miriam Grant's summary judgment motion. We will eventually assess the evidence in a light most favorable to plaintiffs Sebastian Scheiff and Eiledon McClellan. The facts concern the condition of a residence and surrounding land, tasks performed to render the property ready for sale, negotiations between the seller and buyers, the signing of agreements, and inspections performed by the buyer before closing.

David Carey owned residential property at the center of this appeal. Carey died on January 1, 2020. Carey's daughters, Nancy Carey Danforth and Julie Carey Del Moro, served as copersonal representatives of his estate. Appellants Sebastian Scheiff and Eiledon McClellan purchased the property from the David Carey estate. Miriam Grant served as the real estate broker for the estate when Scheiff and McClellan purchased the property. Heritage Land Group, LLC employed Grant as an agent. Although Scheiff and McClellan asserted claims also against the copersonal representatives of the estate, this appeal only concerns claims asserted by Scheiff and McClellan against Grant and

Heritage Land Group, LLC. In this opinion, we do not refer separately to the brokerage firm.

In June 2020, the David Carey estate hired Clark & Young Excavation, LLC and Byrnes Oil to perform services at the property. Byrnes Oil pumped fuel from underground storage tanks in the yard and removed the tanks from the land. Clark & Young removed a 750-gallon furnace fuel tank. According to Oscar Del Moro, Julie Carey Del Moro's husband, the two contractors removed the tanks without incident. The estate never tested the soil previously surrounding the underground storage tanks because the estate lacked any reason to believe the tanks had leaked.

On September 28, 2020, the David Carey estate listed the residence for sale at $785,000.00. Miriam Grant served as the listing broker for the estate. On February 18, 2021, Nancy Carey Danforth obtained a roof repair estimate for the residence from Elsom Roofing, Inc. totaling $17,868.11. For that amount, Elsom Roofing would:

> * Take out roofing permit.
> * Remove & haul away existing roofing layers.
> * Supply & install W-Valley metal in all valleys[.]
> * Supply & install ice and water shield on all eves per code.
> * Supply & install 15 lb. ASTM felt.
> * Supply & install new painted edge metal.
> * Supply & install new flashings for protrusions.
> * Supply & install roof vents per code.
> * Supply & install Owens Corning Duration shingles with 130 mph wind warranty.
> * Supply & install I.B. Single Ply Roofing System on front porch and dead valley on south section of home.

Clerk's Papers (CP) at 81.  We have no direct evidence that Miriam Grant received a copy of this February 18 estimate.

On May 12, Tektoniks employee Justin Ware emailed Nancy Carey Danforth:

> High [sic] this is Justin Ware with Tektoniks.  Elsom roofing asked me to contact you with a quote for the removal of your *current asbestos containing roof*.  If this is something you are still interested in[,] please let me know and I will get you over a quote as quickly as possible.

CP at 254 (emphasis added).  That same day, Danforth requested and obtained an asbestos abatement proposal from Tektoniks based on the information provided to Tektoniks by Elsom Roofing.  Tektoniks proposed to remove and dispose of 3,000 square feet of asbestos located in the roof of the residence at a price of $18,948.32.  We have no direct evidence as to whether the David Carey estate forwarded the Tektoniks proposal to Miriam Grant.

On May 14, 2021, Nancy Carey Danforth received the following email from an Elsom Roofing employee:

> Attached is the revised estimate for your roof.  I removed the tear off and disposal and added in the sheeting.  Unfortunately, the cost of the sheeting is insane right now so it raised the price quite a bit.  One issue we are going to be up against is schedule.  We've added a 4th crew to help speed along the jobs but we are still looking at October.  We understand if that is unacceptable and you need to find someone who is able to get there sooner.  Please let me know if you have any questions.

CP at 124.  Under the revised proposal, Elsom Roofing bid the sum of $24,627.07 to:

4

> \* Take out roofing permit.
> \* Supply and install 7/16 OSB sheeting.
> \* Supply & install W-Valley metal in all valleys[.]
> \* Supply & install ice and water shield on all eves per code.
> \* Supply & install Synthetic Felt on remainder of roof.
> \* Supply & install new painted edge metal.
> \* Supply & install new flashings for protrusions.
> \* Supply & install roof vents per code.
> \* Supply & install Owens Corning Duration shingles with 130 mph wind warranty.
> \* Supply & install I.B. Single Ply Roofing System on low sloped porch roof and dead valley on south section of home.

CP at 126. The revised estimate no longer included removal and disposal of existing roof layers, but added sheeting.

On May 25, 2021, married couple Sebastian Scheiff and Eiledon McClennan, as buyers, and the David Carey estate, as seller, entered into a residential purchase and sale agreement for the home at $705,000. Real estate agent Sara Erwin represented Scheiff and McClellan during the transaction. A Form 36 Counteroffer Addendum, a Form 22D Optional Clauses Addendum, and a Form 35 Inspection Addendum accompanied the agreement. The Form 22D Optional Clauses Addendum required that the seller pay for the cost of the replacement of the roof.

We quote portions of the Inspection Addendum:

> 1. INSPECTION CONTINGENCY. This Agreement is conditioned on Buyer's subjective satisfaction with inspection of the Property and the improvements on the Property. *Buyer's inspections may include, at Buyer's option and without limitation, the structural, mechanical and general condition of the improvements to the Property, compliance with building and zoning codes, an inspection of the Property for hazardous*

*materials, a pest inspection, and a soils/stability inspection.* Buyer's general home inspection must be performed by Buyer or a person licensed under RCW 18.280. Buyer may engage specialists (e.g. plumbers, electricians, roofers, etc.) to conduct further inspections of the Property.

. . . .

3. BUYER'S NOTICE. *This inspection contingency shall conclusively be deemed waived and Seller shall not be obligated to make any repairs or modifications unless within 15 days* (10 days if not filled in) *after mutual acceptance of this Agreement (the "Initial Inspection Period"), Buyer gives notice (a) approving the inspection and waiving this contingency; (b) disapproving the inspection and terminating the Agreement; (c) that Buyer will conduct additional inspections; or (d) proposing repairs to the property or modifications to the Agreement.* If Buyer disapproves the inspection and terminates the Agreement, the Earnest Money shall be refunded to Buyer. *If Buyer proposes repairs to the property or modifications to the Agreement, including adjustments to the purchase price or credits for repairs to be performed after Closing, the parties shall negotiate as set forth in Paragraph 5, below.* . . . .

4. INSPECTION REPORT. Buyer shall not provide the inspection report, or portions of the report, to Seller, unless Seller requests otherwise or as required by Paragraph 5.

a. Waiver of Contingency by Buyer. If Buyer provides any portion of the inspection report to Seller without Seller's prior written consent or as required by Paragraph 5, the inspection contingency shall conclusively be deemed waived.

. . . .

5. ADDITIONAL TIME FOR INSPECTIONS. *If an inspector so recommends, Buyer shall have additional time to obtain further evaluation of any item by a specialist at Buyer's option and expense if, on or before the end of the Initial Inspection Period, Buyer provides Seller a copy of the inspector's recommendation and notice that Buyer will seek additional inspections.* If Buyer gives timely notice of additional inspections, Buyer shall have 5 [days] (5 days if not filled in) after giving the notice to obtain additional inspection(s) as recommended by the inspector.

. . . .

8. OIL STORAGE TANKS. *Any inspection regarding oil storage tanks or contamination from such tanks shall be limited solely to determining the presence or non-presence of oil storage tanks on the Property, unless otherwise agreed in writing by Buyer and Seller.*

CP at 240-41 (emphasis added). Based on the language of this addendum, Sebastian

Scheiff and Eiledon McClellan would waive the inspection contingency on June 9, 2021,

fifteen days from the signing of the agreement on May 25, 2021, if they did not give the

Carey estate notice as required by subsections 3(a)-(d) of this addendum.

On May 27, 2021, two days after execution of the signing, Sara Erwin, the real

estate agent for Sebastian Scheiff and Eiledon McClellan, emailed Scheiff:

> Here is the counter.
> As we discussed, I'll wait to hear from Elsom Roofing about their
> bid.
> Also, inspector Brian Fullen would look at the crawl space to help
> determine any water damage from roof ($150).
> And, after our conversation, there are a few possibilities regarding
> our counter since the roof replacement is not going to be done. I'll be in
> touch after I hear from Elsom roofing.

CP at 285. Parties typically do not engage in additional offers and counteroffers after

signing an agreement. We assume that inspections stirred concerns that led to additional

negotiations and offers.

On May 28, 2021, Miriam Grant, real estate broker for the David Carey estate,

emailed Sara Erwin a Form 36 Counteroffer Addendum containing the counteroffer we

assume Erwin referenced in her May 27 email to Sebastian Scheiff. The counteroffer

addendum revoked the obligation of the estate to replace the roof as originally written in

section 12 of the Form 22D Optional Clauses Addendum. Erwin replied to Grant's email

later that same day:

7

[T]he biggest consideration for the clients is the roof—they have concerns about the condition of the underlayment, etc., especially after seeing some water damage spots on some of the rooms' ceilings. They talked to their banker to see if the roof needs to be replaced before closing and were told it depends on the appraiser's notes. They understand that roof questions can have better answers with an inspector during the feasibility/inspection period. So, after much discussion, they have asked me to give two options regarding the roof—one is to lower their offer by $10K and they'll take care of the roof or they up their price by $10K and ask for sellers to provide [a] new roof. If the roof bid was $20K roughly, they thought splitting that number would be fair.

CP at 190.

Also on May 28, Nancy Carey Danforth forwarded to agent Miriam Grant the email she received from the Elsom Roofing employee on May 14 regarding the revised roof replacement estimate for $24,627.07. The next morning, on May 29, Grant forwarded the email and revised estimate to Sebastian Scheiff and Eiledon McClellan's agent Sara Erwin. In her email to Erwin, Grant represented that the revised total increased in price due to the cost of materials. Grant did not mention the revised total eliminated the task of removal and disposal of existing roof layers but added the task of adding sheeting. Grant sent Erwin a separate email twenty minutes later informing her that the Carey estate would not lower the purchase price. On May 29, Erwin forwarded the email chain containing the revised estimate to Scheiff.

According to Sebastian Scheiff, he and Eiledon McClellan closed the agreement to purchase in reliance on this May 14 estimate prepared by Elsom Roofing for roof repair. The estimate did not mention any asbestos abatement or the presence of asbestos in the

8

roof of the residence. No one informed Scheiff and McClellan that Tektonics provided a proposal for removing asbestos. From this evidence, Scheiff later concluded that Miriam Grant possessed knowledge of the asbestos before the closing of the sale.

On May 31, 2021, the David Carey estate signed the Form 36 Counteroffer Addendum that excluded the seller's obligation to replace the residence's roof. Sebastian Scheiff and Eiledon McClellan signed the addendum on June 1, the date of the offer's expiration.

Sebastian Scheiff and Eiledon McClellan hired Acute Inspection Company to inspect the condition of the residence, including the roof. On June 7, 2021, Megan Ravenscroft of Acute Inspection Company inspected the property on behalf of Scheiff and McClellan. Ravenscroft did not inspect the roof because of danger in mounting the roof. That same day, Ravenscroft sent Scheiff and real estate agent Sara Erwin an email with an inspection report attached. In the email, Ravenscroft wrote, in part: "[o]verall a nice home." CP at 256. Ravenscroft's inspection report commented on the roof:

> Materials: Visually accessible from ground. Not mounted due to roof conditions making mounting of roof dangerous.
> Materials: Clay tile.
> Observations:
> - *Missing tiles noted. Serviceability of roof is questionable; it should be evaluated and repaired as necessary by a professional roofing contractor.*
> - *Recommend roofing contractor to evaluate.*
> - Indications of past or present water leaks, seeps, or condensation at eaves.

- Clean roof areas: Significant amounts of organic debris evident.

CP at 258 (emphasis added).

Sebastian Scheiff and Eiledon McClellan also hired Blue Mountain Environmental Consulting Company, Inc., (BMEC) to perform a Phase I Environmental Site Assessment (Phase I ESA) on the property. As part of the assessment, Scheiff forwarded, at the request of BMEC, to the David Carey estate a questionnaire which, in part, asked the estate whether it knew of "[u]nderground storage tank applications, permits, or registrations" for the property and whether there had ever been "any registered or unregistered above or underground storage tanks located on the property." CP at 167-68. The estate declined to answer any questions in the questionnaire.

Yancy Meyer, an environmental professional at BMEC, performed the Phase I ESA on June 9, 2021. The June 23 assessment report prepared by Meyer commented about the property;

> According to the OSHA Asbestos Construction Standard (29 CFR 1926.1101), building owners and employers are required to identify the potential asbestos hazards within their facilities, and provide that information upon request to employees that may work near those hazards. *During the on-site inspection, various suspect asbestos-containing materials building materials were observed.* As defined in NESHAP 61.141, *the observed materials may be classified as regulated asbestos-containing materials, and prior demolition, renovation, or any other activity that may disturb these materials, either an inspection should be performed by an AHERA accredited Building Inspector or the materials should be handled as asbestos-containing.*
> . . . .

10

>   *During the site inspection an area of stained soil was observed at the site. It is the opinion of BMEC that this area should be sampled for petroleum soil contamination (PCS), and the extent of PCS should be measured to determine the amount of soil to be removed. Confirmation sampling after PCS removal should be conducted to insure the PCS has been properly abated.*
>   A service pit was located in one of the outbuildings. If this service pit has a dirt floor it should also be sampled to investigate possible PCS associated with the service pit.
>   *There are six 55-gallon barrels of oil that are scheduled to be disposed of by Byrnes Oil. It is the opinion of BMEC that these barrels and their contents should be removed and disposed of properly.*
>   . . . .
>   . . . The farm maintenance shop, located in one of the out buildings, has a waste oil burner [the 750-gallon barrel] which hasn't been used in years. *We found six remaining 55-gallon barrels of waste-oil which had been normally used in the burner before it was shut down. However, they are already scheduled to be disposed of by Byrnes Oil.*
>   . . . .
>   The term "asbestos" is applied to a group of naturally occurring fibrous, inorganic hydrated mineral silicates. Asbestos-containing building materials (ACBM) were widely used in building applications as fireproofing, insulation, and soundproofing from about 1946 until the EPA banned its use. Any material containing more than one percent asbestos is considered an ALM by the Environmental Protection Agency (EPA). . . .
>   . . . As defined in NESHAP 61.141, *the observed materials may be classified as regulated asbestos-containing materials, and prior to demolition, renovation, or any other activity that may disturb these materials, either an inspection should be performed by an AHERA accredited Building Inspector or the materials should be handled as asbestos-containing.*

CP at 262-64, 268 (emphasis added).

The purchase and sale agreement read that closing would occur on June 30, 2021.

Closing occurred on July 16, 2021.

After closing, Sebastian Scheiff and Eiledon McClellan learned of the presence of asbestos in the roof. Scheiff then spoke with Julie Carey Del Moro and asked why the estate had not disclosed the presence of asbestos. Del Moro replied that the actions and inactions that the David Carey estate took came at the direction of Miriam Grant. According to Del Moro, Grant told the estate that it need not disclose the asbestos in the roof.

Sebastian Scheiff also called Miriam Grant, who did not deny knowledge of the asbestos. Grant declared that the estate did not need to disclose the presence of asbestos.

PROCEDURE

Sebastian Scheiff and Eiledon McClellan filed suit against Nancy Carey Danforth and Julie Carey Del Moro, as the copersonal representatives of the David Carey estate, and Miriam Grant, the estate's real estate broker. Scheiff and McClellan asserted the same causes of action against all three defendants: fraudulent concealment and negligence. Scheiff and McClellan alleged that the defendants, at the time of the sale, concealed the presence of asbestos and petroleum contamination on the property. Scheiff and McClellan alleged that the three defendants knew of the defects and that they, the buyers, lacked knowledge. They further claimed that the defects could not have been discovered with a reasonable inspection. The negligence allegations echo the facts alleged in the cause of action for fraud. Scheiff and McClellan asserted that all three

12

defendants breached an obligation of due care by deliberately hiding the petroleum contamination and asbestos. Only the claims against Grant are on appeal.

Miriam Grant filed a motion for summary judgment seeking dismissal of Sebastian Scheiff and Eiledon McClennan's negligence and fraudulent concealment claims. Grant denied that she owed the buyers a duty of care. She further contended that no facts showed that she breached the standard of care for a real estate agent as outlined in RCW 18.86.030(1). Grant and her counsel, Mona Geidl, filed declarations in support of the motion.

In response to Miriam Grant's summary judgment motion, Sebastian Scheiff and Eiledon McClellan argued that Grant breached common law duties of care and statutory duties of care owed to them. Scheiff and McClellan asserted that Grant breached the common law duty of reasonable care by directing the sellers to conceal information related to the presence of asbestos and the existence and removal of underground tanks. Scheiff and McClellan also maintained that Grant breached the duties of a real estate broker outlined in RCW 18.86.030 by concealing those same important facts.

With his response, Sebastian Scheiff filed a declaration with exhibits attached. Scheiff and Eiledon McClellan also requested the superior court to strike the declarations of attorney Mona Geidl and Miriam Grant because they contained inadmissible evidence. We label this motion as the first motion to strike. According to Scheiff and McClellan,

13

Geidl offered testimony in her declaration not based on personal knowledge, and Grant's declaration contained conclusory statements, hearsay, and speculation.

In reply in support of her summary judgment motion, Miriam Grant filed a second declaration and a declaration from Julie Carey Del Moro. In turn, Sebastian Scheiff and Eiledon McClellan moved to strike the two new declarations because the pleadings asserted new theories in support of the summary judgment motion. We designate this motion as the second motion to strike.

At the commencement of the summary judgment motion hearing, the superior court denied the motion to strike the recent declarations of Miriam Grant and Julie Carey Del Moro. The court did not address the request to strike the initial declarations of Grant and Mona Geidl. The superior court granted Grant's motion for summary judgment.

## LAW AND ANALYSIS

On appeal, Sebastian Scheiff and Eiledon McClellan challenge the superior court's ruling that ignored one motion to strike declaration testimony and that denied the other motion. Scheiff and McClellan also challenge the court's substantive ruling granting the summary judgment motion.

### Motion to Strike Declarations

Sebastian Scheiff and Eiledon McClennan argue the trial court erred in ignoring their first motion to strike declarations and in denying their second motion to strike. As a

result, according to the couple, the court improperly considered inadmissible evidence and allowed new arguments on reply. We decline to address this assignment of error.

In their brief, Sebastian Scheiff and Eiledon McClellan assert that Mona Geidl's declaration contained testimony of facts not within her personal knowledge. Scheiff and McClellan advance that Miriam Grant's declaration included conclusory facts, hearsay, and speculation. Finally, the two argue that the second declaration of Grant and the declaration of Julie Carey Del Moro asserted new issues into the summary judgment proceeding. Scheiff and McClellan, however, fail to identify those portions of the declarations that violate rules of evidence. Scheiff and McClellan further fail to cite any rules of evidence violated and refrain from any argument as to why unidentified passages from the declarations violated rules of evidence. Finally, the two do not argue that consideration of any inadmissible evidence prejudiced them, let alone explain how prejudice occurred.

Under RAP 10.3(a)(6), an appellant's brief must include arguments supporting the issues presented for review and citations to legal authority. *Collins v. Clark County Fire District No. 5*, 155 Wn. App. 48, 95-96, 231 P.3d 1211 (2010). Without supporting argument or authority, an appellant waives an assignment of error. *Smith v. King*, 106 Wn.2d 443, 451-52, 722 P.2d 796 (1986). We need not consider arguments not developed in the briefs. *State v. Dennison*, 115 Wn.2d 609, 629, 801 P.2d 193 (1990).

In the argument section of their appeal brief, Sebastian Scheiff and Eiledon McClellan cite to the clerk's papers that encompass their motion pleadings before the superior court. By these citations, Scheiff and McClellan may wish this court to review the arguments inserted into trial court pleadings.

A party may not incorporate, by reference, trial court briefs into appellate briefs. *US West Communications, Inc. v. Utilities & Transportation Commission*, 134 Wn.2d 74, 111-12, 949 P.2d 1337 (1997); *Mine Holding Trust v. Pavlish*, 32 Wn. App. 2d 727, 737-38, 559 P.3d 517 (2024). The appellate court will entertain only issues argued to it. RAP 10.3; RAP 12.1; RAP 13.7; *State v. Hoffman*, 116 Wn.2d 51, 71, 804 P.2d 577 (1991); *Howell v. Spokane & Inland Empire Blood Bank*, 114 Wn.2d 42, 46, 785 P.2d 815 (1990). Any issue for which a party has incorporated arguments by reference into their appellate court brief is deemed abandoned. *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998). The Supreme Court described the purpose behind the rule against incorporation:

> Respondents would have no idea what issues required a response, and appellate courts would have to search trial court records and clerk's papers and address all issues raised below. Such an "end run" around the Rules of Appellate Procedure will not be sanctioned; the primary purpose of the rules is to afford fairness and notice of the scope of review to the court and all litigants.

*State v. Kalakosky*, 121 Wn.2d 525, 540 n.18, 852 P.2d 1064 (1993).

16

Common Law Duty of Care

Although Sebastian Scheiff and Eiledon McClellan appeal the entirety of the grant of summary judgment, they do not argue on appeal that Miriam Grant could be liable for fraud or fraudulent concealment. Scheiff and McClellan limit their claim to negligence. The two contend that Grant violated both a common law duty of care to the buyers of the property and statutory duties to the buyers, but they do not separate the discrete arguments. We consider any appeal of the dismissal of the fraud claim to be waived. We sunder our analysis of the common law claim from the statutory claim.

On appeal, Sebastian Scheiff and Eiledon McClennan contend that they raised questions of fact as to whether Miriam Grant knew of the presence of asbestos in the roof and the earlier existence and removal of underground fuel tanks on the property. The couple asserts that, if they prove knowledge at trial, Grant suffers liability for failing to disclose that information to them before closing.

We review familiar principles of summary judgment procedure. This court reviews a trial court's decision on a motion for summary judgment de novo and views the facts and reasonable inferences in a light most favorable to the nonmoving party. *Ramey v. Knorr*, 130 Wn. App. 672, 685, 124 P.3d 314 (2005); *Holmes v. Wallace*, 84 Wn. App. 156, 161, 926 P.2d 339 (1996); *Watkins v. ESA Mgmt., LLC*, 30 Wn. App. 2d 916, 923, 547 P.3d 271 (2024). A defendant moving for summary judgment on the issue of negligence has the initial burden to show the absence of an issue of material fact or

17

that the plaintiff lacks competent evidence to support an essential element of her case. CR 56(c); *Seybold v. Neu*, 105 Wn. App. 666, 676, 19 P.3d 1068 (2001). Once the moving party has met this burden, the burden shifts to the nonmoving party to produce evidence sufficient to support a reasonable inference that the defendant was negligent. *Seybold v. Neu*, 105 Wn. App. 666, 676 (2001). The nonmoving party may not rely on mere allegations contained in the pleadings. *West v. Thurston County*, 169 Wn. App. 862, 866, 282 P.3d 1150 (2012); *Seybold v. Neu*, 105 Wn. App. 666, 676 (2001). Rather, they must offer affidavits or other means provided in CR 56 to set forth specific facts showing that there is a genuine issue for trial. *West v. Thurston County*, 169 Wn. App. 862, 866 (2012). If the nonmoving party fails to meet this burden, summary judgment is appropriate. *Berry v. King County*, 19 Wn. App. 2d 583, 587, 501 P.3d 150 (2021).

A plaintiff asserting a negligence claim must establish (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, (3) the breach of that duty resulted in an injury to the plaintiff, and (4) the breach was a proximate cause of the plaintiff's injury. *Walter Family Grain Growers, Inc. v. Foremost Pump & Well Services, LLC*, 21 Wn. App. 2d 451, 459, 506 P.3d 705 (2022). To defeat summary judgment on a negligence claim, the nonmoving party must show that a genuine issue of material fact exists with respect to any elements of duty, breach of duty, causation, and injury. *Jackass Mt. Ranch, Inc. v. South Columbia Basin Irrigation District*, 175 Wn. App. 374, 394, 305 P.3d 1108 (2013). While the breach and proximate cause elements

18

are generally fact questions and not subject to summary judgment, these questions can be decided as a matter of law if reasonable minds could not differ on the conclusion. *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999).

Some of the Washington cases cited by Sebastian Scheiff and Eiledon McClellan examine claims for negligent misrepresentation. Scheiff and McClellan did not specifically plead a cause of action for negligent misrepresentation. We assume, but do not decide, that a cause of action for negligence encompasses the theory of negligent misrepresentation. Miriam Grant does not argue otherwise.

A real estate broker is held to a standard of reasonable care and is liable for making negligent, though not innocent, misrepresentations concerning the property to a buyer. *Hoffman v. Connall*, 108 Wn.2d 69, 72, 736 P.2d 242 (1987). This rule applies despite the real estate broker being an agent of the seller, not the buyer. *Hoffman v. Connall*, 108 Wn.2d 69, 74 (1987). A broker holds a limited duty toward a purchaser of real property. *Hoffman v. Connall*, 108 Wn.2d 69, 74 (1987). The broker acts negligently by repeating material representations made by the seller only if the broker knows, or reasonably should know, of their falsity. *Hoffman v. Connall*, 108 Wn.2d 69, 74 (1987); *Tennant v. Lawton*, 26 Wn. App. 701, 615 P.2d 1305 (1980). The law does not immunize the broker from any liability for false representations to one not her client because she is a professional in a unique position to verify critical information given to the buyer by the seller. *Hoffman v. Connall*, 108 Wn.2d 69, 75 (1987).

19

A real estate agent must take reasonable steps to avoid disseminating to the buyer false information. *Hoffman v. Connall*, 108 Wn.2d 69, 75 (1987). The agent must employ a reasonable degree of effort and professional expertise to confirm or refute information from the seller that he knows, or should know, is pivotal to the transaction from the buyer's perspective. *Hoffman v. Connall*, 108 Wn.2d 69, 75 (1987); *McRae v. Bolstad*, 32 Wn. App. 173, 646 P.2d 771 (1982), *aff'd*, 101 Wn.2d 161, 676 P.2d 496 (1984). A broker must be alert to potential misrepresentations made by a seller, but does not become a guarantor of every statement made by the seller. *Hoffman v. Connall*, 108 Wn.2d 69, 77 (1987).

In *Bloor v. Fritz*, 143 Wn. App. 718, 180 P.3d 805 (2008), this court grafted the duty found in the tort of negligent misrepresentation into a duty held by a real estate agent to a buyer. The court affirmed a trial court ruling imposing liability on the seller's real estate agent in favor of the buyers because the agent had gained knowledge of earlier methamphetamine manufacturing on the sold property. A claimant suing for negligent misrepresentation must prove by clear, cogent, and convincing evidence that (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false

20

information proximately caused the plaintiff damages. *Lawyers Title Insurance Corp. v. Baik*, 147 Wn.2d 536, 545, 55 P.3d 619 (2002); *Bloor v. Fritz*, 143 Wn. App. 718, 734 (2008). The decision implies that the agent suffers liability not only for affirmatively providing false information, but also for failing to disclose material information to the buyer.

Sebastian Scheiff and Eiledon McClennan argue that Miriam Grant breached her duty as a real estate agent by both directing the David Carey estate to conceal information regarding asbestos and by failing to disclose that information to them before closing. Grant insists, to the contrary, that she lacked knowledge, before closing, of asbestos being in the roof. She emphasizes that neither she nor the David Carey estate tested the residence for asbestos. A review of the facts in a light favorable to Scheiff and McClellan shows otherwise.

Miriam Grant represented the David Carey estate when one of the copersonal representatives received the first Elsom Roofing repair estimate on February 18, 2021, at the time the representative received the Tektoniks asbestos removal estimate on May 12, and at the time the estate received a revised Elsom Roofing repair estimate that no longer included removal and disposal of the current roof on May 14. When asked by Sebastian Scheiff, after the sale, why she did not disclose the information earlier, Grant did not protest that she had knowledge of the information. Instead, she responded that she and her client lacked any obligation to disclose the asbestos.

21

Byrnes Oil excavated the tanks from under the property in August 2020, before the property being listed on September 28, 2020. An email sent by Miriam Grant to Sebastian Scheiff and Eiledon McClellan's agent, Sara Erwin, on June 5, 2021, established that the sellers knew of above-ground tanks. Although the email makes no mention of underground tanks, the record suggests that those tanks may be the ones that Byrnes Oil removed from the property. An email sent by Julie Carey Del Moro's husband to Grant on June 6 also showed that the David Carey estate and Grant knew of above-ground tanks on the property. Although the email does not mention that these tanks were earlier underground, other evidence in the record suggests such.

We conclude that the presence of asbestos and the recent removal of underground storage tanks adversely impact the value of the property. The Tektonics bid for removal of 3,000 square feet of asbestos totaled $18,948.32. We also conclude, however, that the undisputed facts establish that Sebastian Scheiff and Eiledon McClellan did not reasonably rely on the concealment of the asbestos and underground storage tanks.

Sebastian Scheiff and Eiledon McClellan hired Acute Inspection Company to inspect the condition of the residence, including the roof. Megan Ravenscroft, of Acute Inspection Company, did not inspect the roof because of dangerous conditions. To repeat, Ravenscroft's inspection report prepared for Scheiff commented about the roof:

> Materials: Visually accessible from ground.  Not mounted due to
> roof conditions making mounting of roof dangerous.
> Materials: Clay tile.
> Observations:
> - *Missing tiles noted.  Serviceability of roof is questionable; it
>   should be evaluated and repaired as necessary by a professional
>   roofing contractor.*
> - *Recommend roofing contractor to evaluate.*
> - Indications of past or present water leaks, seeps, or
>   condensation at eaves.
> - Clean roof areas: Significant amounts of organic debris
>   evident.

CP at 258 (emphasis added).  Although the report read that Ravenscroft did not climb onto the roof, the report recommended that Scheiff employ a roofing contractor to evaluate the roof.

Sebastian Scheiff knew that the David Carey estate declined to answer questions about underground storage tanks on the land.  Scheiff had asked the estate to respond.  A reasonable buyer would have continued to insist for the information.

BMEC's environmental assessment disclosed suspected asbestos at the property and warned of the need to carefully handle asbestos-containing material.  The environmental assessment also noted the presence of stained soil on the land.  BMEC recommended that the area be sampled for petroleum contamination.  BMEC warned of the presence of six 55-gallon barrels of oil on the property and the need to properly dispose of the barrels.

On June 7, 2021, real estate agent Sara Erwin shared pictures of the tanks with Sebastian Scheiff. When sharing the pictures with Scheiff, Erwin remarked that Byrnes Oil would retrieve them from the property. With the photos, the Carey estate shared that the tanks contained old diesel fuel.

The summary judgment record does not show that Sebastian Scheiff reviewed the environmental assessment or the property inspection report, but he hired the professionals who prepared the reports. Those professionals sent the reports to him. Scheiff intended that the reports inform him of the condition of the property before closing the purchase. If he did not review the reports, he should have.

Sebastian Scheiff and Eiledon McClellan contend that they or their house inspector conducted a reasonable inspection of the roof, but the poor condition of the roof precluded testing for asbestos. This argument fails to recognize that at least Scheiff knew of the inability of Megan Ravenscroft to surmount the roof. Ravenscroft recommended to Scheiff that he procure the services of a roof contractor. Ravenscroft also warned of a roof in poor condition. The poor condition prevented her from ascending to the roof. More importantly, the BMEC evaluation warned of suspected asbestos and cautioned Scheiff of the danger with the presence of asbestos.

Sebastian Scheiff and Eiledon McClellan contend that Miriam Grant and the David Carey estate refused to answer questions of Scheiff and McClellan's environmental evaluator about removal of underground storage tanks. Scheiff knew

24

before closing that the estate declined to answer the questions.  Under the purchase and sale agreement, Scheiff and McClellan could have insisted on answers to the questions in order to complete the inspection.  Regardless, the BMEC report noted stained soil at the property.  BMEC recommended a sampling for petroleum contamination.  The report also noted the presence of six 55-gallon barrels of oil

*Hoel v. Rose*, 125 Wn. App. 14, 105 P.3d 395 (2004), parallels this appeal except for the *Hoel* decision analyzes liability of the seller for misrepresentation.  For purposes of this appeal, however, the same rules apply to claims against the real estate broker.  This court reversed an award in favor of the buyers because substantial evidence did not support a trial court finding that buyers Dale Hoel and Michelle Jones justifiably relied on representations of seller Betty Jo Rose that the lot purchased contained 6.43 acres.  Before closing, Hoel retained a surveyor.  The survey revealed the lot size to be 5.04 acres.  Thus, before closing, Hoel gained specific information that conflicted with the representation on which he based his cause of action.

Statutory Duty of Care

Sebastian Scheiff and Eiledon McClellan contend that Miriam Grant violated a duty owed to them under RCW 18.85.361(3).  This statutory subsection renders a licensed real estate broker subject to discipline by the State of Washington for:

25

> *[k]nowingly committing*, or being a party to, any material fraud, misrepresentation, concealment, conspiracy, collusion, trick, scheme, or device whereby any other person lawfully relies upon the word, representation or conduct of the licensee.

(Emphasis added.) Under this statute, a broker is only guilty of *knowingly committing* a misrepresentation. *Hoffman v. Connall*, 108 Wn.2d 69, 76 (1987).

Former RCW 18.86.030 (2013), in effect at the time the complaint was filed, also imposes duties on the real estate broker:

> (1) Regardless of whether a broker is an agent, the broker owes to all parties to whom the broker renders real estate brokerage services the following duties, which may not be waived:
> (a) To exercise reasonable skill and care;
> (b) To deal honestly and in good faith;
> . . . .
> (d) To disclose all existing material facts known by the broker and not apparent or readily ascertainable to a party; provided that this subsection shall not be construed to imply any duty to investigate matters that the broker has not agreed to investigate.

The statute has since been revised, replacing "licensee" with "broker" and clarifying that these duties are owed by the broker to all those involved in the real estate transaction. *See* former RCW 18.86.030(1). Former RCW 18.86.010(9) (2013), in effect when the complaint was filed, defines a "material fact" for purposes of the statute as:

> information that substantially adversely affects the value of the property or a party's ability to perform its obligations in a real estate transaction, or operates to materially impair or defeat the purpose of the transaction.

RCW 18.86.030 further provides:

(2) Unless otherwise agreed, a broker owes no duty to conduct an independent inspection of the property or to conduct an independent investigation of either party's financial condition, and owes no duty to independently verify the accuracy or completeness of any statement made by either party or by any source reasonably believed by the broker to be reliable.

We perform the same analysis that we performed in response to Sebastian Scheiff and Eiledon McClellan's claim under the common law. A question of fact exists, under the two statutes, as to whether Miriam Grant knew of the asbestos, storage tanks, and soil contamination. That information adversely impacted the value of the property. Nevertheless, the presence of the asbestos, tanks, and contamination was reasonably ascertainable to Scheiff and McClellan.

In response to Sebastian Scheiff and Eiledon McClellan's claims under common law and statutes, Miriam Grant contends Scheiff and McClellan waived contractual claims by signing the purchase and sale agreement. According to Grant, although Scheiff and McClellan conducted inspections during the initial inspection period as permitted under the agreement, they failed to timely notify her of a request for additional inspections before the expiration of that period. Grant also argues that Scheiff and McClellan waived any additional claims because they decided not to further inspect the roof or oil tanks in order to prevent the mortgage lender from raising red flags and in

No. 39650-9-III
*Scheiff v. Del Moro*

order to qualify for a home loan. Because of our disposition of the appeal on other grounds, we need not and do not address these contentions.

CONCLUSION

We affirm the summary judgment dismissal of all claims against Miriam Grant.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____, J.
Fearing, J.

WE CONCUR:

_____
Cooney, J.

_____
Korsmo, J.P.T.[†]

---

[†] Kevin M. Korsmo, a retired judge of the Washington State Court of Appeals, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1).